**Andrew J. NEUENS, Plaintiff,**

v.

**CITY OF COLUMBUS,
et. al., Defendants.**

No. 99–CV–1384.

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 1, 2001.

James Donald McNamara, Columbus, OH, for plaintiff.

Robert Latham Washburn, Jr., Cloppert Portman Sauter, Latanick & Foley, Columbus, OH, for defendants.

### *OPINION AND ORDER*

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on all of the Defendants' Motions for Summary Judgment. Defendant City of Columbus, which also filed a Motion for Summary Judgment, has been dismissed as a party by stipulation. Jurisdiction lies under 42 U.S.C. § 1983. A hearing on the Motions for Summary Judgment was held on October 12, 2001.

For the following reasons, the Court hereby **GRANTS** summary judgment as to the state claim for intentional infliction of emotional distress, and **DENIES** summary judgment as to the federal claim under 42 U.S.C. § 1983 and the state claim for negligence.

## II. FACTS

Because this case comes before the Court on the Defendants' Motions for Summary Judgment, the Court views the facts in the light most favorable to the Plaintiff.

On the evening of December 25, 1998, the Plaintiff, Andrew Neuens, went out

with two friends, Nate Faught and Chad Spinosi. The men went first to a neighborhood establishment, then to a dance club. Subsequently, they decided to go to the Waffle House restaurant to eat. They arrived at the Waffle House at 3385 E. Dublin–Granville Road at approximately 2:00 a.m., the morning of December 26, 1998.

According to the Plaintiff, the Waffle House restaurant is fairly small. The outer door leads into a small foyer or hallway, and an inner door opens from that foyer into the restaurant. Inside, the cash registers are directly across from the doorway. To the right of the registers is a jukebox, behind which are three of the restaurant's booths.

When the Plaintiff and his companions entered the Waffle House, they seated themselves in the first booth nearest the door, behind the jukebox. The Plaintiff sat alone on the side of the booth that allowed him to face the door and cash registers. Mr. Faught and Mr. Spinosi sat across from him, facing the other booths. Upon entering the restaurant, the men noticed a security guard, Defendant John Padgett, by the door.

Soon after the Plaintiff and his friends began to eat the food they had ordered, a group of people consisting of Defendants Bridges, Parker, and Kincaid, along with another man and two women ("Defendant group"), entered the restaurant. Prior to entering the Waffle House, the Defendant group had been at a bowling alley. While there, some members of the group, including Defendant Parker, engaged in a fight, which Defendant Bridges, who is a police officer, took no action to prevent, stop, or report. According to the Plaintiff, the Defendant group began creating problems as soon as they entered the Waffle House by acting "loud, drunk, and obnoxious." Defendant Bridges acknowledged that at least two members of his group were visibly inebriated, and that he himself had probably consumed alcohol that night, as well. When they came in, the Defendant group seated itself at the third booth behind the jukebox.

According to the Plaintiff, the Defendant group continued to harass the Plaintiff and his companions even after they sat down at their booth. Specifically, Defendant Kincaid yelled expletives toward them. Although neither the Plaintiff nor his friends had ever met anyone in the Defendant group prior to that encounter, apparently some members of the Defendant group mistook the Plaintiff and his friends for the people with whom they had fought at the bowling alley earlier that evening.

As the Plaintiff, Mr. Faught, and Mr. Spinosi finished their meals, the tension between the two groups grew. Margaret Tracy, the waitress for both tables, believed that the tension was escalating to the point that it would ultimately lead to violence. According to Waffle House policy as printed in the Waffle House employee handbook, if an employee sees a situation in the restaurant that she believes will imminently turn to violence, she has a duty to report that situation to a manager. Despite this Waffle House rule, Ms. Tracy did not report the situation that she observed between the Plaintiff and the Defendants to her manager. According to her deposition testimony, however, Ms. Tracy did inform the security guard, Defendant Padgett, that she was concerned that a fight would soon erupt.[1]

---

1. Defendant Padgett claims that although Ms. Tracy did speak to him, their conversation concerned clearing a table for customers, not the impending violence. He claims that he was never made aware of the situation, and had no knowledge of the potential for violence. For the present purposes, however, the Court must assume that Ms. Tracy did, in fact, warn Defendant Padgett about the situation.

When the Plaintiff and his companions finished eating their meal, Defendant Padgett approached their table and advised them to leave the restaurant. Subsequently, Mr. Spinosi got out of the booth, and turned to walk out of the restaurant. According to the Plaintiff, as soon as Mr. Spinosi got up, the Defendant group also got up, passed the Plaintiff's table, and moved toward the exit. Before Mr. Spinosi reached the outer door, but after he had gone through the inner door, Defendant Parker pushed him from behind. As Mr. Spinosi turned around, he was then punched twice in the face, first by Defendant Parker, and then by Defendant Kincaid.

The Plaintiff stood up from his table after the Defendant group had already passed by. As he approached the cash register, he heard a commotion behind him, and turned to see what was happening. The next thing the Plaintiff remembers is waking up in the hospital hours later. The Plaintiff subsequently learned that Defendant Parker, after punching Mr. Spinosi, walked toward the register and punched the Plaintiff from behind, knocking him to the floor, unconscious. Apparently, Defendant Parker then kicked the Plaintiff in the head. Defendant Officer Bridges admits seeing Defendant Parker standing near the Plaintiff, but denies seeing Defendant Parker punch or kick him. Nonetheless, at that point, Defendant Bridges grabbed Defendant Parker and pulled him out of the restaurant. The Defendant group then departed the Waffle House in two separate vehicles.

It is unclear whether Defendant Padgett tried physically to restrain Defendants Kincaid and Parker during this incident. Mr. Faught testified during his deposition that the security guard did nothing other than caution the other members of the Defendant group not to get involved. After the Defendant group left, however, Defendant Padgett radioed his employer, Defendant Smith Detective & Security, Inc. ("SDSI" or "Smith Security") for backup. After contacting his employer, a Smith Security supervisor and a uniformed Columbus police officer arrived at the Waffle House within four minutes.

As a result of this incident, the Plaintiff was taken to a hospital, where he was treated for injuries to his eye, severe lacerations to his eyebrows and lips, and a concussion, along with other minor injuries. On December 23, 1999, the Plaintiff filed a Complaint against Defendants City of Columbus, Ohio, Officer Bridges, Ernest Parker, Josh Kincaid, John Padgett, Smith Detective & Security, Inc., and J. Thomas & Co., Inc. (d/b/a Waffle House). The Complaint raised federal claims against the City of Columbus and Officer Bridges for violations of 42 U.S.C. § 1983 and 42 U.S.C. § 1985. The Complaint additionally raised state claims against the Defendants for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993).

The non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir.1993) (citation omitted). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (finding summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fᴇᴅ.R.Cɪᴠ.P. 56(e); *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994). Furthermore, the existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

## IV. DISCUSSION

### A. Federal Claims

The Plaintiff's First Amended Complaint asserted federal claims under 42 U.S.C. §§ 1983 and 1985 against the City of Columbus and Defendant Officer Bridges. On June 25, 2001, a Stipulation was entered dismissing the City of Columbus as a party. At the hearing on the Motions for Summary Judgement, the Plaintiff acknowledged that he is no longer pursuing his claim under § 1985. Therefore, the only remaining federal claim is the § 1983 claim brought against Defendant Bridges. Specifically, the Plaintiff asserts that Defendant Bridges violated his right to substantive due process, protected by the Fourteenth Amendment to the United States Constitution. Defendant Officer Bridges has asserted the affirmative defense of qualified immunity against this claim.

### 1. 42 U.S.C. § 1983

■ The Plaintiff has alleged that Defendant Bridges infringed the Plaintiff's constitutional rights in violation of 42 U.S.C. § 1983.[2] To succeed on a § 1983 claim, the plaintiff must show that (1) a person acting under color of law (2) deprived him of his rights secured by the United State Constitution or its laws. *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir.1994). At oral argument on the Motions for Summary Judgement, Defendant Bridges conceded that he was acting under color of law at the time of this incident. Therefore, the Court addresses only the issue of whether Defendant Bridges deprived the Plaintiff of his

---

**2.** The relevant portion of that statute reads:
Every person who, under color of any statute, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the depri-

vation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

substantive due process rights under the Fourteenth Amendment.

■ The Due Process Clause of the Fourteenth Amendment does not impose upon the state an affirmative duty to protect its citizens against private acts of violence; rather, the amendment only limits the state's ability to take affirmative action that denies an individual of life, liberty, or property without due process. *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Nonetheless, the state may be liable for private acts when the state acts in some way to increase the danger to individuals from those private acts. *Id.* at 201, 109 S.Ct. 998 ("While the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."). The Sixth Circuit has relied on *DeShaney* to establish a state-created danger theory of substantive due process liability. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir.1994) ("In *DeShaney*, the Supreme Court ... stated that a duty to protect can arise in a noncustodial setting if the state does anything to render an individual *more vulnerable* to danger.").

■ Specifically, a plaintiff must show three elements to succeed on a state-created danger claim. First, the Plaintiff must demonstrate that the state actor took affirmative actions that "either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom*, 136 F.3d at 1066 (citing *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir.1995)). Second, the Plaintiff must show that the state actor created a "special danger," which can be done through a showing that the state's actions placed the specific victim at risk, as opposed to placing the general public at risk. *Id.* (ex-

plaining that this element is necessary to distinguish actions giving rise to liability from actions that the state takes every day that can potentially increase any person's risk of harm, such as releasing someone from police custody). Third, the state actor must have known, or clearly should have known, that his actions "specifically endangered an individual." *Id.* (citations omitted).

The affirmative action requirement of the state-created danger claim arises out of *DeShaney's* holding that the state generally is under no obligation to protect citizens from the private acts of others. Although it is true that the state cannot be liable when it has done nothing to increase the risk of harm to an individual, the converse is also true. Thus, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.'" *Kallstrom*, 136 F.3d at 1066 (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982)). Accordingly, state actors have been found liable for violating an individual's right to substantive due process when they have affirmatively placed that individual in a position of increased risk of harm. *See Kallstrom*, 136 F.3d at 1066 (finding that the city's affirmative act of giving personal information regarding officers and their families to defense counsel for a violent gang that the officers helped to prosecute placed the officers in serious risk of harm); *Davis v. Brady*, 143 F.3d 1021, 1023–25 (6th Cir.1998) (concluding that officers placed the plaintiff in greater harm than he would have been if they had not acted at all when they abandoned the plaintiff, while he was inebriated, on an unfamiliar highway, and was subsequently hit by a car); *Stemler v. City of Florence*, 126 F.3d 856, 868–69 (6th Cir.1997) (stating that officers did not merely fail to protect the victim, but in-

creased her risk of harm when they took her out of her friend's car and physically placed her in the truck of her intoxicated boyfriend, who subsequently crashed into a guardrail, killing the victim). Furthermore, state actors have been found liable when they have deliberately decided *not* to act in a certain way, such that their *inaction* increased the risk of harm to a particular individual. *See Culberson v. Doan,* 125 F.Supp.2d 252 (S.D.Ohio 2000); *Sheets v. Mullins,* 109 F.Supp.2d 879 (S.D.Ohio 2000); *Smith v. City of Elyria,* 857 F.Supp. 1203 (N.D.Ohio 1994).

In *Culberson,* the police chief was alerted to the fact that the body of the decedent whose murder was being investigated was probably located in a certain pond. *Culberson,* 125 F.Supp.2d at 268. Although the police chief was alerted to this fact in the presence of the suspected killer, a man who was a good friend of the police chief, he nonetheless determined not to secure the decedent's body, and to postpone searching the pond until the next day, despite the risk that the evidence could be tampered with or the body removed. *Id.* The next day, when the pond was drained, no body was found, but there were footprints on the bottom of the pond and muddy prints coming out of the water, indicating that someone could have recently removed something from the pond. *Id.* at 269. The court determined that these facts presented a genuine issue of material fact as to whether the police chief made the plaintiffs more vulnerable to the danger that their daughter's body would be removed from the pond. *Id.* Thus, the court determined that the plaintiffs raised a genuine issue of material fact when the defendant's alleged affirmative action was a "deliberate choice" not to act in such a way as to prevent the ultimate harm.[3]

In *Sheets,* the plaintiff called the police, seeking help to retrieve her daughter from the father, Roger Montgomery, who had custody of the daughter and who had assaulted and threatened the plaintiff with a gun and a knife, and threatened to kill their daughter. *Sheets,* 109 F.Supp.2d at 882. The officer, however, (1) told the plaintiff that she would have to go to court to try to get custody of the child, rather than try to get her daughter back herself; (2) stopped looking for Montgomery after not finding him at his home, even though the plaintiff had already said he was elsewhere; and (3) failed to indicate to officers who took over his shift that Montgomery had threatened to kill the child over whom he had physical custody. *Id.* Furthermore, when Montgomery called the officer, with whom he was close friends, a couple days later, the officer failed to try to ascertain his location. *Id.* at 883. Four days after the plaintiff made her initial complaints, Montgomery killed the child and himself. *Id.* Based on these facts, the court found that the plaintiff had raised a genuine issue of material fact as to whether the officer increased the danger to the baby who was killed. *Id.* at 890. Thus, the court in *Sheets,* like the court in *Culberson,* looked to the officer's decisions not to act in such a way that could have prevented the crime to conclude that the plaintiff posed a genuine issue as to whether the officer's actions increased the risk of harm to the minor child.

---

**3.** Arguably, the *Culberson* decision is distinguishable because the court in that case relied on the fact that the decedent's body had been taken into the "functional custody" of the police chief once he started to search around the pond to find a state-created danger. *Culberson,* 125 F.Supp.2d at 269. Here, however, Defendant Bridges had neither physical nor functional custody over the Plaintiff. Nonetheless, the Court finds *Culberson* instructive to the extent that the court in that case found the police chief's decision not to act may have increased the Plaintiff's vulnerability to the harm of losing the decedent's body.

In *Smith*, the plaintiffs alleged that officers who were called out to a woman's home when she sought to have her ex-husband removed therefrom refused to remove him and merely told the woman to initiate eviction proceedings if she wanted him out. *Smith*, 857 F.Supp. at 1206. Furthermore, the officers told the ex-husband that if his ex-wife continued to throw his belongings out of the house, he could bring them back in. *Id.* Subsequently, the ex-husband stabbed and killed the woman. *Id.* at 1207. The court found that "the facts here support a claim that the police officers' *affirmative acts* created or increased the danger to [the decedent]. The police officers did not merely fail to perform their duties; they told [the ex-husband] that he did not have to leave, and advised him to go back if [his ex-wife] tried to throw him out." *Id.* at 1210. Thus, the court found that the plaintiffs had presented sufficient evidence to prevent summary judgement on their substantive due process claim, on the ground that the private actor may have used the "apparent authority" given to him by the officers to remain in his ex-wife's home, where he later killed her. *Id.* (finding that the plaintiffs raised a genuine issue of material fact as to whether the police officers "affirmatively increased the danger to [the decedent] while limiting her ability to help herself and [making] her more vulnerable to attack").

Here, as in the above cited cases, the Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether Defendant Officer Bridges' actions on the night of the altercation increased the Plaintiff's vulnerability to harm, giving rise to liability under the state-created danger theory. Specifi-cally, a reasonable trier of fact could conclude that, although Defendant Bridges took no part in either the planning or commission of this assault,[4] he made a deliberate decision not to prevent his friends from acting as they did, either at the Waffle House or earlier at the bowling alley. A reasonable trier of fact could conclude that this purposeful decision by Defendant Bridges, evidenced by his failure to prevent, intervene in, or report the altercations, caused Defendants Parker and Kincaid to feel more bold in their assault on the Plaintiff. A trier of fact might conclude that, were it not for the presence and tacit approval of their friend, the police officer, Defendants Parker and Kincaid would not have acted toward the Plaintiff as they did. Like the ex-husband in *Smith*, Defendants Parker and Kincaid may have used the apparent authority given to them by Defendant Bridges to attack, assault and batter the Plaintiff. Thus, Defendant Bridges' affirmative decision could be found to be the affirmative act that formed the basis of a substantive due process violation because that decision created an atmosphere of increased danger to the Plaintiff.

In addition to the affirmative act requirement, the Plaintiff must show that the Defendant's actions created a "special danger" that placed the Plaintiff specifically at risk. *Sheets*, 109 F.Supp.2d at 889. This Court finds that the Plaintiff has presented sufficient evidence for a reasonable trier of fact to conclude that Defendant Bridges's failure to act under the circumstances created a danger specifically to the Plaintiff and his companions. As alleged herein, the evidence gives no indication that any one else in the restaurant, let alone in the general public, would have

4. The Plaintiff has, in fact, presented his theory that Defendant Bridges helped plan the actions of Defendants Parker and Kincaid and was intending to act as their "back-up." The Plaintiff, however, has not presented sufficient evidence to support this theory as a basis for defeating the Defendant's Motion for Summary Judgment.

been endangered by Defendant Bridges' actions.

Finally, the Plaintiff must show that the Defendant knew or should have known that his actions would result in harm to the Plaintiff, the specific individual who was ultimately harmed. *See Duvall v. Ford,* 1999 WL 486531, at *3, 187 F.3d 635 (6th Cir.1999) (determining that the defendants' conduct of releasing a prisoner into a work release program with minimal supervision without first checking his criminal background was too attenuated from the ultimate harm that resulted after the prisoner escaped from that program for the defendants to have known that their actions would cause harm to the victim); *Gazette,* 41 F.3d at 1066–67 (concluding that there could be no substantive due process violation because the defendant police officers' failure to aggressively investigate a missing person's report was too remote from the ultimate harm of the victim's death for them to have known that such harm could result from their actions). A reasonable trier of fact could conclude that, under the circumstances, Defendant Bridges knew or should have known that his failure to prevent his friends from acting as they did would result in harm specifically to the Plaintiff.

Based on the foregoing, the Court finds that the Plaintiff has presented sufficient evidence to raise genuine issues of material fact as to whether Defendant Bridges infringed the Plaintiff's right to substantive due process under a state-created danger theory of liability. The Court, therefore, **DENIES** the Defendant's Motion for Summary Judgment on the Plaintiff's § 1983 claim.

### 2. Qualified Immunity

■ Government officials sued in their individual capacities are entitled to seek qualified immunity. *Harlow v. Fitz-*

*gerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity extends to individuals performing discretionary functions unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* A right is "clearly established" if "[a] reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). This means only that the unlawfulness of the act must have been apparent in light of pre-existing law, even if the precise action at issue was not previously held to be unlawful. *Id.* at 640, 107 S.Ct. 3034.

■ At the time of this incident, it was clearly established within the Sixth Circuit that an individual has a right to be free from state-created danger. *Kallstrom,* 136 F.3d at 1066; *Gazette,* 41 F.3d at 1065 (citing *DeShaney* for the proposition that there may be a duty to protect when the state leaves an individual more vulnerable to danger than he would have been had the state actor not intervened at all). The Sixth Circuit and district courts within the circuit had clearly recognized that a state actor can be liable if he acts so as to significantly increase the risk of danger to an individual from a third party. *See* discussion *supra* Part IV.A.1. Based on the state of the case law in December 1998, the Court finds that a reasonable person in Defendant Bridges's position would have known that a state actor could be liable under § 1983 for taking actions that increase an individual's vulnerability to harm from third parties. Therefore, Defendant Bridges is not entitled to the affirmative defense of qualified immunity.

### B. State Law Claims[5]

The Plaintiff has raised numerous state law claims against each of the Defendants.

**5.** On July 2, 2001, a Stipulation of Voluntary

Dismissal was entered as to the Plaintiff's

First, the Plaintiff asserted claims of assault and battery against Defendants Parker, Kincaid, and Bridges. He subsequently voluntarily dismissed that claim as against Defendant Bridges, and Defendants Parker and Kincaid have not filed motions for summary judgment. Second, the Plaintiff asserted a claim of intentional infliction of emotional distress against Defendants Parker, Kincaid, and Bridges. Only Defendant Bridges has filed a Motion for Summary Judgment on that claim. Third, the Plaintiff asserted claims of negligence against Defendants J. Thomas & Co. ("Waffle House"), SDSI, and John Padgett. Each of those Defendants has filed a Motion for Summary Judgment. Therefore, for the purpose of ruling on the Defendants' Motions for Summary Judgment, the Court will discuss only the Plaintiff's claims of intentional infliction of emotional distress and negligence.

### 1. Intentional Infliction of Emotional Distress

The Plaintiff's First Amended Complaint alleged a cause of action for intentional infliction of emotional distress against Defendants Bridges, Kincaid, and Parker. Only Defendant Bridges has moved for summary judgement with respect to this claim.

■ In order to prove a claim of intentional infliction of emotional distress, the plaintiff must show that the defendant intentionally or recklessly caused him serious emotional distress by extreme and outrageous conduct. *McNeil v. Case W. Reserve Univ.*, 105 Ohio App.3d 588, 664 N.E.2d 973, 975 (1995) (citing *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983)). The behavior complained of must go beyond the intentionally tortious or even the criminal. *Yeager*, 453 N.E.2d at 671. Rather, the conduct

must be so extreme and outrageous as " 'to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 671 (quoting Rest.2d of Torts § 46, cmt. d (1965)). Furthermore, the emotional distress allegedly suffered must be serious. *Id.* In order to defeat a motion for summary judgment on a claim of intentional infliction of emotional distress, the plaintiff must present evidence sufficient to create a genuine issue of material fact as to the defendant's behavior and the severity of the injury suffered. *McNeil*, 664 N.E.2d at 975–76; *see Uebelacker v. Cincom Systems, Inc.*, 48 Ohio App.3d 268, 549 N.E.2d 1210, 1220 (1988) (finding that the plaintiff raised a genuine issue of material fact as to his emotional distress when he submitted along with his pleadings an affidavit from his wife detailing the various symptoms of his distress).

■ The Court finds that the Plaintiff has not presented sufficient evidence to create a genuine issue of material fact on his claim of intentional infliction of emotional distress. First, even when viewed in the light most favorable to the Plaintiff, Defendant Bridges' actions, while possibly negligent or even reckless, do not rise to the level of extreme or outrageous conduct, as that standard has been interpreted by the case law. *See Retterer v. Whirlpool Corp.*, 111 Ohio App.3d 847, 677 N.E.2d 417, 421–23 (1996) (upholding the lower court's grant of summary judgment for the defendants on a claim of intentional infliction of emotional distress where, among other things, the defendants, the plaintiff's supervisors at work, repeatedly called him into their office under threat of termination and then restrained him by his wrists as they "poked" and "tickled" him on his chest and stomach so that he would

claims under state law for negligent infliction of emotional distress as to all Defendants and as to the claim for assault and battery against

Defendant Bridges. Those claims were dismissed with prejudice.

"jump and flop"); *McNeil,* 664 N.E.2d at 976 (finding no extreme or outrageous conduct by the employer when an employee continuously harassed and threatened to assault a fellow employee).

Even if a trier of fact finds that the Defendant did make a conscious decision to allow his friends to commit assault and battery upon the Plaintiff and then help them flee, those actions without more are not extreme and outrageous. Second, although the Plaintiff has alleged that he has suffered emotional distress to the point of not being able to perform normal daily functions or work for some period of time, this bare allegation without any evidentiary support is insufficient to defeat the Defendant's Motion for Summary Judgment. *See Hockenberry v. Village of Carrollton,* 110 F.Supp.2d 597, 605 (N.D.Ohio 2000) (granting summary judgment for the defendant where the plaintiff failed to provide any specific evidence that would support his allegation that he and his family suffered serious emotional distress).

Therefore, the Court hereby **GRANTS** summary judgment in favor of Defendant Bridges on the Plaintiff's claim of intentional infliction of emotional distress.

### 2. Negligence[6]

The Plaintiff has asserted claims of negligence against the Waffle House, SDSI, John Padgett, and Officer Bridges.

In order to assert a successful claim of negligence under Ohio law, a plaintiff must show that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; and (3) as a result of that breach, the defendant proximately caused actual loss or damage to the plaintiff. *Mussivand v. David,* 45 Ohio St.3d 314, 544 N.E.2d 265, 270 (1989);

*Deeds v. Am. Sec.,* 39 Ohio App.3d 31, 528 N.E.2d 1308, 1311 (1987).

#### a. Officer Bridges

The Plaintiff states in his Memorandum Contra Defendant Bridges' Motion for Summary Judgment that he asserted a state law claim of negligence against Defendant Bridges. In the First Amended Complaint, however, the Plaintiff raised allegations of negligence only as to Defendants Waffle House, SDSI, and Padgett. The Plaintiff has not subsequently amended his Complaint to add a claim of negligence against Defendant Bridges.

Under the Federal Rules of Civil Procedure, "[a] pleading which sets forth a claim for relief ... shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8(a). Furthermore, a plaintiff may not use a summary judgment motion to raise a claim that he failed to state in his complaint. *Lombard v. MCI Telecomm. Corp.,* 13 F.Supp.2d 621, 626 (N.D.Ohio 1998) (citations omitted). Although usually this rule applies to prevent a plaintiff from asserting additional claims in his own motion for summary judgment, it applies equally here, where the Plaintiff is attempting to use the Defendant's Motion for Summary Judgment to state a claim that he omitted from his Complaint.

Based on the above rules, the Court finds that the Plaintiff has not adequately set forth a claim of negligence against Defendant Bridges in his Complaint, and he cannot now use the Defendant's Motion for Summary Judgment to do so. Defendant Bridges' Motion for Summary Judgment on the Plaintiff's alleged negligence claim is **GRANTED.**

---

**6.** The Plaintiff has alleged a separate count of *"respondeat superior"* against SDSI. This should really be included in the negligence claim, as it merely supplies one theory upon which Defendant SDSI can be found negligent.

### b. Waffle House

The Plaintiff alleges that the Waffle House is negligent because it had a duty to provide a safe, secure, and reasonable environment to Waffle House patrons, and breached that duty when it allowed the Defendants to strike him.

 As the owner of the premises on which this incident occurred, the Waffle House owed the Plaintiff, an invitee, a duty of ordinary care. *Newton v. Penn. Iron & Coal, Inc.*, 85 Ohio App.3d 353, 619 N.E.2d 1081, 1083 (1993) (recognizing the common law rule that landowners owe a duty of ordinary care to invitees, people whom the landowner invites onto his land for his own benefit). Where the premises owner does not, and in the exercise of ordinary care could not, know of a danger that causes injury to the invitee, the owner is not liable for the injury. *Howard v. Rogers*, 19 Ohio St.2d 42, 249 N.E.2d 804, 807 (1969). Such knowledge of a danger depends on the foreseeability of the harm. *Daily v. K–Mart Corp.*, 9 Ohio Misc.2d 1, 458 N.E.2d 471, 474 (1981). Foreseeability of the harm may arise from prior incidents of a similar nature on the premises. *Townsley v. Cincinnati Gardens, Inc.*, 39 Ohio App.2d 5, 314 N.E.2d 409, 411 (1974). Ohio courts, however, have ruled that a totality of the circumstances approach is the preferable method for determining whether the ultimate harm was foreseeable. *Reitz v. May Co. Dept. Stores*, 66 Ohio App.3d 188, 583 N.E.2d 1071, 1074 (1990). Under either approach, the ultimate harm may be generally foreseeable, based on the type of activity that could be expected to occur on the premises at any time, specifically foreseeable due to the particular circumstances leading up to the harm. *See id.* at 1075 (discussing Rest.2d of Torts § 344, which provides that if the premises owner, based on his past experience or knowledge of his business, "should reasonably anticipate careless or criminal conduct on the part of third persons, either generally *or at some particular time*, he may be under a duty to take precautions against it") (emphasis added).

 The Court believes that the Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether the harm that the Plaintiff incurred was foreseeable to the Waffle House. The Plaintiff has presented evidence that, under the totality of the circumstances approach, this particular incident was foreseeable based on the behavior of the Defendants and their interactions with the Plaintiff and his companions throughout their time at the Waffle House on this particular night. Additionally, the Plaintiff has presented some evidentiary support for his claim that, not only was the incident foreseeable, but it was actually foreseen by at least one Waffle House employee.

The Court finds, based on the above, that a reasonable trier of fact could find that the harm to the Plaintiff was foreseeable to the Waffle House. Furthermore, a trier of fact drawing such a conclusion could also find that the Waffle House breached its duty of ordinary care when it failed to prevent this foreseeable harm. Therefore, the Court **DENIES** Defendant Waffle House's Motion for Summary Judgment as to the Plaintiff's claim of negligence.

### c. SDSI and John Padgett

SDSI has a contract with the Waffle House to provide security for the restaurant. Under the contract, SDSI assigns one of its employee security guards to work in the restaurant. On the night in question, SDSI employee John Padgett was the security guard at the Waffle House.

The Plaintiff alleges that SDSI and Security Officer John Padgett were negligent

because they breached their duty to provide a safe, secure, and reasonable environment to Waffle House patrons. The claim against SDSI is premised on a *respondeat superior* theory of liability for the Security Officer's negligence, as well as claims of negligent hiring, retention, and supervision of Defendant Padgett. As to the *respondeat superior* theory, the Plaintiff alleges that because the security officer acted negligently while acting as an employee of SDSI, within the scope of his employment, SDSI can be liable for his negligence. *See Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.*, 81 Ohio App.3d 728, 612 N.E.2d 357, 362 (1992) (asserting that for *respondeat superior* to apply, the employee must be liable for a tort committed in the scope of his employment). The Plaintiff bases his allegation of Defendant Padgett's negligence on his failure to prevent the harm to the Plaintiff, particularly in light of the fact that, according to the Plaintiff, a Waffle House waitress had notified him that a fight was probably going to ensue.

Ohio law imposes no heightened duty to prevent a third party from harming another absent a special relationship between the would-be rescuer and the victim. *Gelbman v. Second Nat'l Bank of Warren*, 9 Ohio St.3d 77, 458 N.E.2d 1262, 1263 (1984) (citing Rest.2d of Torts §§ 314, 315). In the case of private security guards, an increased duty to protect individuals from harm by third parties will be imposed only when such a duty is specified in the guard's contract. *Eagle v. Mathews–Click–Bauman, Inc.*, 104 Ohio App.3d 792, 663 N.E.2d 399, 402 (1995). In the absence of such a contractual duty, private security officers may be held liable in negligence only for failure to exercise ordinary care. *Id.*

The Court believes that the Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether Defendant Padgett breached a duty to exercise ordinary care. Although Defendants SDSI and Padgett have asserted that the contract between SDSI and Waffle House specifies that guards are hired only to protect the Company's property, and therefore have no heightened duty under Ohio law to protect customers from harm by third parties, the Plaintiff has presented evidence that, in practice, the guards had additional duties that were not specifically written into the terms of the contract. Both the Waffle House and SDSI have acknowledged that the manager at the Waffle House would tell Defendant Padgett what he was supposed to do each night he reported for work. On the night in question, the manager told Padgett, among other things, to prevent any "rowdiness," and help provide "crowd control." Although Defendant Padgett has claimed that his instructions from the Waffle House manager pertained only to his duty to protect the Company's property, a question of fact remains as to whether such instructions really go beyond the protection of property, and extend to the protection of customers.

The Court finds that a reasonable trier of fact could conclude that the manager's instructions to Defendant Padgett did, in fact, relate to persons and not just property. As such, under *Eagle v. Mathews–Click–Bauman*, Defendant Padgett would be subject to a heightened standard of care, which the trier of fact may find he breached by failing to prevent the harm to the Plaintiff. The Court also finds, however, that a reasonable trier of fact could conclude that the manager's instructions really did not extend Defendant Padgett's duties beyond the protection of property. Were the trier of fact to so find, it could nonetheless conclude that Defendant Padgett breached his duty of ordinary care under the circumstances. Under either standard, the Court believes that if a

breach by Defendant Padgett were found, the trier of fact could further conclude that SDSI is liable for Defendant Padgett's breach under a *respondeat superior* theory of liability. Therefore, the Court **DENIES** summary judgment to Defendants SDSI and Padgett on the Plaintiff's claim of negligence.

### V. CONCLUSION

Based on the foregoing, the Court **DENIES** summary judgment as to the 42 U.S.C. § 1983 claim and the negligence claims, and **GRANTS** summary judgment as to the claim of intentional infliction of emotional distress.

**IT IS SO ORDERED.**